## The State v. Coleman Williams.

1. After verdict in criminal cases, it is presumable that the names of the jurors specified in the *venire facias* have been drawn according to law, particularly when the writ expresses that they were "good and lawful jurors, duly appointed as the statute requires."

2. It is not necessary that the return of the *venire facias* should be technically stated in the record; if it appear that the writ issued and that the grand jury was composed of persons named in the writ, it will be presumed they are the same, and it is immaterial whether they were summoned or not.

3. When change of venue, after a transmission of the original papers and a transcript of the orders in the cause, a copy of the *venire facias* certified by the Clerk of the Court from which the change took place, cannot be received as a part of the record.

4. But after a plea of the general issue no objection reaching the *venire facias*, can be made, and therefore the want of one is not error.

5. Upon a change of venue, the Court to which the case is removed is bound to presume all things regular before the change, as the existence of a good caption to the indictment, and it devolves upon the prisoner to shew any fatal irregularity; so it is presumable that the record has been duly transmitted and delivered.

6. It is not error to refuse a *certiorari* when it is obvious that the object thereof cannot be thereby obtained.

7. The permission or refusal of leave to withdraw the general issue to plead in abatement or demur, is discretionary with the Court even in criminal cases.

8. In a capital case it is not ground of peremptory challenge of a juror that he has formed upon common report, and expressed an opinion of the guilt of the prisoner, if the juror believes that such opinion would have no influence in the formation of his verdict, should the evidence on the trial be different from the report of the facts.

9. After a juror is accepted and sworn, the Court cannot discharge him from the panel without the consent of the prisoner, for any cause *in esse* at the time he was sworn, although the cause may have been *discovered* after he was empannelled.

10. And where a juror is so erroneously discharged, and the prisoner is convicted, a reversal of the judgment does not discharge him from a second trial.

IT appears from the exemplification of a record of the Circuit Court of Montgomery, sent to the county of Autauga, that at March term, 1829, of said Court, a bill of indictment was preferred against Coleman Williams, for the murder of Silas Gorce, which commenced as follows: "Indictment. The State of Alabama v. Coleman Williams. The State of Alabama, Montgomery county, Circuit Court, March term, 1829. The grand jury for the county of Montgomery aforesaid, on their oath present," &c., and which was returned by said jury indorsed, "a true bill," also the further indorsements of the name of the case, and the names of the witnesses for the prosecution. To this indictment, upon which the prisoner was arraigned, he pleaded "not guilty;" whereupon, it was by

the Court ordered, that he be served with a copy of the
bill of indictment, and that the sheriff summon thirty six
jurors to pass upon said trial, including those summoned
to appear by the *venire facias*, to serve for the term, and
that the prisoner be served with a list thereof.   The case
was thereupon continued upon the prisoner's affidavit.
At the succeeding term, it appearing to the Court that the
prisoner had been arraigned and pleaded "not guilty," and
that he had been served two entire days with a copy of the
indictment, and a list of the jury who were to pass upon
his trial; and it further appearing from the prisoner's affi-
davit, that a fair and impartial trial could not be had in
Montgomery county, it was therefore ordered on pris-
oner's motion, that the venue be changed to the county of
Autauga; that the sheriff have said prisoner before the
said Circuit Court thereof, and the clerk was directed
"safely to transmit to the clerk of the Circuit Court of Au-
tauga county, the indictment and all original papers, to-
gether with a certified copy of all orders, and other pro-
ceedings which have been had in the case, and a certified
copy of this order."

At October term, 1829, of Autauga Circuit Court, being
the first term thereof after said change of venue, the case
was again continued on the prisoner's affidavit; and also
at April term, 1830, of said Court, the prisoner being pre-
sent, and it appearing that the copy of the bill of indict-
ment served upon the prisoner, did not contain the in-
dorsement made by the foreman of the grand jury who
found the bill, nor the name of the prosecutor, it was or-
dered that the case stand continued.   On Thursday, the
fourth day of October term, 1830, of said Court, being
the day set for the trial of this case, it appearing that the
prisoner had been served pursuant to order, two entire
days previous thereto, with a list of the jurors summoned
to pass upon his trial, and a copy of the indictment, with
the indorsements thereon, the prisoner was tried and con-
victed; and was accordingly sentenced to death, subject to
the decision of this Court, upon points referred as "novel
and difficult."

It appears that on the first day of the said last mentioned
term, the prisoner moved the Court, 1st for a *certiorari*,
returnable forthwith, to be directed to the clerk of the
Circuit Court of Montgomery, requiring him to certify to
the Court there, the names of and manner of drawing the
jurors for March term, 1829, of the Circuit Court of Mont-

JANUARY 1831

The State
v.
Williams.

gomery, if of record in said Court, or on the minutes thereof; together with the record of the *venire facias*, returnable to said term of said Court; and also the record of said Court, in relation to the drawing, swearing and impannelling of the grand jury for said term of said Court, with the names of said grand jury; 2d. to permit the prisoner to withdraw his plea of "not guilty" to the indictment, and to permit him to plead in abatement of the same, a defect of qualification in one of the grand jurors who found the said bill, and the non-return of the *venire facias* by the sheriff of Montgomery; or to demur to the indictment as he might elect, or as the Court might direct. These motions were supported by affidavit of the prisoner's counsel, setting forth that the prisoner had been arraigned, and pleaded "not guilty," before a copy of the indictment was furnished him pursuant to law; that at the time he pleaded not guilty, he was not advised that one Charles McCartney, a member of the grand jury, was not a free-holder or house-holder of Montgomery county, at the time of the finding of said bill; nor that the *venire* was not entered of record; nor that the sheriff of Montgomery had never made a return to the said *venire*, the last two of which facts appear by the original records; and that the record sent to Autauga Court, did not shew in what manner the jury for the term at which said bill was presented were drawn, nor the names of the jurors who presented said bill. All which matters had been discovered by the affiant within the previous week, and as he believed, were not before known to the prisoner. The prisoner also made oath to the same facts; but the Court overruled the motions, reserving the questions that might arise thereon.

In resisting the motion for the *certiorari*, the counsel for the prosecution produced in Court, a paper which is attached to the record, as an exhibit to this Court, certified under the seal of the clerk of the Circuit Court of Montgomery, and which purported to be a transcript from the records of this case in that Court, setting forth a copy of the *venire facias*, returnable to March term, 1829, of that Court, the return of the sheriff thereon, and the names of the persons who were drawn as the grand jury for said term, of which Charles McCartney was a member, and Joel Tatum, foreman. But it was objected to by the counsel for the prisoner, that it was not a part of the record, and that there was no proof how it came into Au-

tauga Court, of which there was in fact none. The ori-
ginal indictment was also produced with the other papers
of the case, and there was no proof to shew how it came
into said Court, other than appeared from the papers and
transcript. As to said supplemental transcript, the Court
did not decide whether it was or was not a part of the
record of the Circuit Court of Montgomery. On Thurs-
day, before proceeding in the trial, the same motions were
renewed on the affidavit of the prisoner, to the same effect
with the former, and stating that at the time he pleaded
"not guilty," he was not apprised that he could then plead
in abatement, a defect of qualification in the grand jurors
who found the indictment; but the Court again overruled
the motions, and likewise reserved the questions of law
arising thereon.

The prisoner then objected to being tried on the indict-
ment produced in the Circuit Court of Autauga, on the
ground that the same had never been certified to that Court
in any manner whatever; and because in the record, as
certified from the Circuit Court of Montgomery, it did
not appear what indictment was presented by a grand jury,
other than appeared on the face of the indictment, and
the indorsements thereon; and because there was no proof
offered, to shew the manner wherein the indictment on
which it was proposed to try the prisoner, came into that
Court. This objection the Court also overruled, reserv-
ing the legal questions that might arise thereon.

It further appears that on the trial, Dixon Hall, Senior,
was called as a juror, who being sworn on his *voir dire,*
answered that he had formed and expressed an opinion as
to the guilt of the prisoner, whereupon the prisoner chal-
lenged him for cause; but the Court overruled the chal-
lenge, and directed the juror to be asked, "is that opinion
formed from common report, or from information received
from the witnesses?" he answered, "from common re-
port." The Court then directed the further question, "if
he evidence on the trial were to turn out different from
what it was reported, would that opinion have any influ-
ence on your verdict?" he answered, "it would not."
The said juror likewise added, in answer to questions put
to him by the prisoner's counsel, "that when he heard the
report he believed it to be true; that he still believed it;
that he had said if the report was true the prisoner ought
to be hung; and that he still thought so, if the report was
true." The prisoner then challenged him for cause, which

58

the Court again overruled, and the prisoner was then put to his peremptory challenge. Several other jurors were in like manner, put on the prisoner for peremptory challenge, the Court reserving the questions of law that might arise thereon.

After the prisoner had exhausted his peremptory challenges, Etheldred Rodgers and Louis Hauser were called as jurors, and stated on the *voir dire*, what the juror Hall had stated above; the prisoner challenged them for cause, which the Court overruled, and they were sworn of the jury to pass on the trial, against the consent of the prisoner; but the Court reserved the questions of law arising thereon.

John Stewart was then sworn on his *voir dire*; put on the prisoner; accepted by him, and was sworn in chief. After six other jurors were sworn in chief, the counsel for the State having ascertained that said juror was not a resident of Autauga county, nor a house-holder or free-holder therein, moved the Court to exclude him from the jury; and the Court after eleven other jurors besides said Stewart had been sworn in chief, informed the prisoner that unless he then accepted him, the juror would be discharged. The prisoner by his counsel, said he declined expressing assent or dissent; and he was accordingly dismissed on the ground that he was not qualified to serve. To all which the prisoner objected, and the Court reserved the questions of law arising upon said discharge.

Henry McMorris was thereupon called as a juror, and objected to by the prisoner, for the reason that twelve jurors had already been sworn in chief; but the Court overruled the objection, and put the juror on the prisoner, who had then exhausted his challenges, and the juror was sworn in chief; the Court as before reserving the questions arising thereon.

On conviction and before sentence, the prisoner by his counsel, moved the following matters in arrest of judgment: 1st. that it did not appear from the record, that any jury was drawn in the manner prescribed by law, for March term, 1829, of the Circuit Court for Montgomery county; 2d. that it did not appear that a *venire facias* was issued to, or returnable to the said Court; 3d. that it did not appear that any grand jury was sworn, drawn or impannelled for the said term of Montgomery Circuit Court; 4th. that it did not appear that any bill of indictment was presented by a grand jury against the prisoner; 5th. that

it did not appear that there was any caption to the indict-
ment on which the prisoner was tried; 6th. that it did not
appear in what manner the indictment on which the pris-
oner was tried, came into this Court, nor did it appear that
the same was in any manner certified into this Court; 7th.
that the indictment on which the prisoner was tried, was
insufficient in law to authorize judgment thereon; 8th.
that the prisoner was arraigned on the indictment, with-
out being furnished with a copy, two entire days previous
to his arraignment, or pleading to the same; 9th. that in
the whole of the record, sufficient did not appear to war-
rant a judgment against the prisoner.   All which points
the Court overruled, and the questions of law originating
therein, together with those arising upon the overruling
of the prisoner's motions; his challenges of the jurors;
the discharge of the juror, Stewart, and substitution of
the juror, McMorris, are here referred for the decision of
this Court, as "novel and difficult."

GOLDTHWAITE, argued for the prisoner, and contended
1st. that there were defects in the record, anterior to the
trial; in this, that it did not appear that a *venire facias*
was legally issued and returned; that the indictment con-
tained no caption; that the record did not shew that the
names of the jurors for the term at which the indictment
was found, were drawn according to the statute, nor did it
disclose how the indictment upon which the defendant
was tried, came into the office of the Circuit Court of Au-
tauga, or that the prisoner had been served with a copy of
the indictment, two entire days previous to his being ar-
raigned thereon, and pleading thereto.   In support of this
point, he cited 2 Hawkins P. C. 561; 2 Hale P. C. 259
—60; Laws of Alabama, 496.   As to the caption of the
indictment, 2 Hale P. C. 165, *et seq;* 3 Bacon's Abridg-
ment, Indictment G. 11; 2 Lord Raymond's Reports, 968,
1039; 1 Term Reports, 313; 2 Hawkins P. C. 355; 3
Bacon's Abridgment, Indictment K; 2 Hawkins P. C.
349.   As to being served with a copy of indictment, Fos-
ter, 229.

2d. That the Circuit Court of Autauga should have
granted the *certiorari* to the clerk of the Circuit Court
of Montgomery, and should have permitted the prisoner
to plead in abatement, or demur to the indictment; to sus-
tain which, he cited Foster, 17, 229; Chitty's Criminal
Law, 297, 437; 4 Blackstone's Commentaries, 351.

3d. That on the trial, the Court below should not have overruled the prisoner's challenges; that the constitution secures to every citizen an impartial jury; that impartial means free from bias or prejudice; he must be indifferent, or he is incompetent, and that a juror who has expressed an opinion, is incompetent. He referred to the Constitution of Alabama, article I. section 10; 2 Thomas' Coke, 520–22; 1 Johnson's Reports, 318; 7 Cranch's Reports, 207; 3 Dallas' Reports, 515; 1 Haywood's Reports, 432; 1 Burr's Trial, 367, 414; Chase's Trial.

4th. That the Court below should not have discharged the juror, Stewart, without the prisoner's consent; to sustain which, he relied on 2 Caines' Reports, 304; 1———— ——— N. C. Reports, 491; 2 Hawkins P. C. 568; Foster, 29 to 39, 619; 3 Coke, 524, 538.

PERKINS, Attorney General, argued for the State, and in opposition to the first point in the argument of the prisoner's counsel, referred as to the finding of the indictment by a legal grand jury, to the Laws of Alabama, 496; as to the drawing of the jury, to the sheriff's return, set out in the supplemental transcript from the record of Montgomery; as to the caption of the indictment, to 1 Chitty, 202; 2 Hale P. C. 165–6–7–8; 2 Hawkins P. C. 561; 4 Institute, 168; and as to service of a copy of the indictment before arraignment, to Foster, 228–9–30; Laws of Alabama, 214, 915.

In opposition to the second point assumed by the prisoner's counsel, he relied on 1 Chitty, 203, 424, 437; 2 Hale, 175, 219; and contended that the record shewed what was intended to be obtained by the *certiorari.*

As to the third point, he argued that the mode pursued by the Court below, was sustained by authority, and cited 1 Burr's Trial, 43; 3 Dallas' Reports, 515.

In the fourth place, he contended that the Court were not called on to make rules for the government of criminal trials, but merely to consider whether the rules already established, were applied in the trial of the prisoner, by the Court below, and that even should the judgment be arrested or reversed, the prisoner could not under our statutes be discharged.

THORINGTON, on same side.

GOLDTHWAITE, in conclusion,

By JUDGE TAYLOR. Many points of law were
decided by the Court below, which have been referred to
this Court, because they were deemed by the judge who
presided, novel and difficult; and this Court has now to
determine whether the sentence which has been pro-
nounced, shall be executed upon the defendant, or the
judgment reversed.

In giving an opinion in the case, I shall pursue the or-
der laid down in the defendant's brief, and consider, 1st.
alleged defects in the record, anterior to the trial; 2d. the
refusal to award the writ of *certiorari*, and to permit the
defendant to withdraw the plea of "not guilty," and plead
in abatement or demur; 3d. the proceedings at the trial,
in relation to the challenge of jurors; 4th. the discharge
of one of the jurors, without the consent of defendant,
after he had been accepted by him and sworn.

Under the first objection, three defects are alleged, 1st.
that it does not appear that a *venire facias* was legally
issued and returned; 2d. that the record contains no cap-
tion to the indictment; 3d. it does not appear how the in-
dictment upon which the defendant was tried, came into
the office of the Circuit Court of Autauga county. It is
insisted that the record should show that the names of the
jurors for the term of the Court at which the indictment
was found, were drawn according to the statute, that a *ve-
nire* was regularly issued, executed and returned.

In the case of *Collier v. The State*,[a] it was determined *a* 2 Stewart's
that after verdict, the Court would presume that the names R. 388.
of the jurors specified in the *venire facias*, had been drawn
according to law, particularly when the writ itself ex-
pressed that they were "good and lawful jurors of your
county, duly appointed as the statutes require," and that
no objection could be made on such ground in this Court.
But it is probable that a plea in abatement would not be
received on this ground. The statute regulating the mode
of drawing the names of the jurors, which are to be in-
cluded in the *venire facias*, is entirely directory, and in-
tended, not for the benefit of those who may be accused
of breaches of the public law, or of suitors in Court, but
to secure the equal distribution of this burden, among all
the citizens of the several counties, who possess the ne-
cessary qualifications. It is therefore no injury to the de-
fendant nor a matter of which he can complain if the ju-
rors' names are not drawn according to the requisitions of
the statute. Nor is it more important that the return of

the *venire facias* should be technically stated in the record. If it appear that the writ has issued, and that the grand jury was composed of persons whose names are in the writ, it will be presumed that they are the same, and it must be totally immaterial whether they were summoned or not. In this case, however it does not appear that a *venire facias* ever issued. The paper which was produced by the counsel for the state at the term in which the trial took place, and which purported to be a copy of the *venire facias* certified by the clerk of the Circuit Court of Montgomery county, certainly cannot be received as a part of the record. After the clerk of the Court, from which a cause is taken by change of venue, has complied with the order by making out a transcript of the orders and transmitting the papers to the Court to which it is ordered, he cannot supply omissions by supplemental copies of parts of the proceedings, however important such part may be. His authority to act at all is the order of the Court, and if he has failed to make out a full exemplification in the first instance, he cannot cure the defect of his own volition, as any other act would not be valid unless a subsequent order authorized it. It is necessary then to determine whether a copy of the *venire facias* is essential to the record in Autauga County. It is certainly necessary that the record of the conviction should contain enough to show that such conviction was legal. But after the general issue has been pleaded, I do not understand that any objection can be made which reaches the *venire facias*. I can find no authority, nor has any been cited by the gentleman who so ably argued this case in behalf of the defendant which authorizes this Court to look back to the *venire facias* for defects on which to reverse the judgment. On the contrary, in the case of the *Commonwealth v. Smith,*[b] Judge Sewall says, " objections to the personal qualifications of the jurors, or to the legality of the returns, are to be made before the indictment is found; and may be received from any person, who is under a presentment for any crime whatever; or from any person present, who may make the suggestion as *amicus curiæ.*" With us indictments are rarely preceded by presentments, and such objections probably might be made by plea in abatement.

As respects the want of a caption, it is certain that if in the Court in which the indictment was found, the record showed none of the facts which are usually contained in the

caption, this would be good cause to quash; or even to ar-<span>JANUARY 1831</span>
rest the judgment. The caption generally specifies the
electing and swearing of the grand jury; gives the names <span>The State</span>
of the jurors, and the fact of the return of the indictment <span>v.</span>
into Court. I would not be understood to say that the in- <span>Williams.</span>
dictment would be quashed unless all these facts were con-
tained in the caption, but surely some of them are essen-
tial. If it did not appear that there were as many as
twelve grand jurors, this would be fatal at any time. In
England where indictments are carried from inferior
Courts into the Court of King's Bench by *certiorari*,
great strictness is required in setting out every thing ne-
cessary to show that the inferior Court had jurisdiction of
the case; and even where the indictments have been found
in that Court there are many cases in which they have
been quashed for defects in the caption. The caption
however may be amended, and made to conform to the
facts of the case.[c] The Court in which the indictment was <span>c 2 Chitty's</span>
found in this case, is one, not of limited, but of plenary <span>Crim. Law</span>
jurisdiction. Every presumption, therefore, is to be made <span>274–5.</span>
in favor of the correctness of its proceedings. By plead-
ing to the indictment many things which would be fatal,
if objected to before, would be waived; among these is the
service of a copy of the indictment two entire days before
the arraignment; if our statute should be construed to re-
quire this; which I am inclined to think would be an in-
correct construction. In this case it was the act of the de-
fendant by which the venue was changed to Autauga
County; the constitution secured to him the right of a tri-
al in the county in which the offence was charged to have
been committed. As the Circiut Court of Montgomery
County is a Court of general jurisdiction, the Court into
which the case was removed was bound to infer that all
things had been regularly done before the charge of venue
was ordered; it was therefore bound to presume that the
caption and other proceedings were regular in the Court
in which the case originated. It devolved then upon the
defendant to show a fatal irregularity. How this was to
be done, it is not necessary to determine; but I will sug-
gest that it might have been done by producing in the
Circuit Court of Autauga a certified copy from the record
of the case in Montgomery by which the error would be
shown, and praying a *certiorari* to obtain an exemplifi-
cation of that part of the record. And although it is true
as a general rule, that this writ can only be awarded from

a superior to an inferior jurisdiction; yet the necessity of the case, would probably authorize it in this.

As to the manner in which the indictment was conveyed into the office of the Circuit Court of Autauga, it must be presumed to have been in conformity with the order which transferred the case from the one Court to the other. That order required, that the Clerk of the Circuit Court for Montgomery County should "safely transmit to the Clerk of the Circuit Court of Autauga County, the indictment and all original papers in the case, together with a certified copy of all orders and other proceedings which have been had in the case." This certified copy of the proceedings is, at the next term of the Circuit Court of Autauga found in the possession, and among the official papers of the Clerk of that Court, and the indictment is filed with them; the case is twice continued by the defendant afterwards; he certainly cannot at so late a period and under these circumstances be heard to say that the indictment does not appear to have come regularly into that Court.

The next point made by the defendant; viz: "the refusal to award the writ of *citiorari*, and to permit the defendant to withdraw the plea of "not guilty" and plead in abatement or demur," is disposed of by what has been already said. By the authority before cited from 9th Massachusetts reports, it appears that the object of this motion could not have been effected even had he been permitted to withdraw the plea of "not guilty" and had the writ of *certiorari* been awarded. His wish was to plead that one of the grand jurors who found the indictment "was not qualified as the law requires, in this, that he was neither a freeholder or householder in Montgomery County." It is required by our statutes that grand jurors shall possess this qualification. But it by no means follows that indictments are vitiated because one or more of them do not possess it. The case in Massachusetts Reports before referred to, informs us that an objection of this kind comes too late, after the indictment is filed; it certainly comes too late after the plea of "not guilty," has been entered. It is true the Court might have permitted the plea to be withdrawn, but it was altogether a matter of discretion; and a discretion, the exercise of which should not have been expected, after the lapse of so long a time from the commencement of the prosecution, and after such repeated continuances at the instance of the accused.

The third point to be considered, is "the proceeding at the trial, in relation to the challenge of jurors." It appears that when the prisoner was put upon his trial, Dixon Hall was called as a juror, who being sworn on his *voir dire*, said that he had formed and expressed an opinion as to the guilt or innocence of the prisoner; the prisoner then challenged him for cause; but the Court overruled the challenge and directed the juror to be asked, " is that opinion formed from common report, or information received from the witnesses." The juror answered, " It was formed from common report." The Court then directed the further question to be asked, " if the evidence on the trial were to turn out different from what it was reported to be, would that opinion have any influence on your verdict," to which the answer was, " it would not." The juror likewise answered to questions put to him by the prisoner's counsel, that " when he heard the report he believed it to be true, that he still believed it; that he had said if the report was true the prisoner ought to be hung; and that he still thought so, if the report was true." The juror was again challenged for cause, which challenge the Court overruled. The same questions were propounded to several other jurors, and similar answers given; the challenge of all of whom for cause was overruled, and in two instances after, the prisoner's peremptory challenges were exhausted. The counsel for the defendant has cited a part of the 10th Section of the bill of rights, which is in the following words, " in all prosecutions by indictment or information the accused shall have a speedy public trial by an impartial jury, &c. That the accused in this case had a right to such a trial none is disposed to deny; the question is, was the method adopted for the examination of the jurors, and the proceedings on the trial, calculated to prevent such a trial? In this investigation the opinions of many eminent Judges of the Courts of different States, and some of the Federal Courts can be appealed to. Some of the questions which have arisen on this part of the record, may be considered as completely put to rest by numerous concurring adjudications. For instance, it has in some cases been much mooted, whether a challenge on account of a fixed opinion as to the merits of the case, was a principal cause of challenge. This has been settled in the affirmative. It has also been contended that a juror could not be interrogated for the purpose of ascertaining, whether he felt a bias in favor of, or against a defendant

upon his trial for a public offence. In *The State v. Norris*[d] the Court was divided in opinion on this subject. But ever since the trial of Aaron Burr for treason before Chief Justice Marshall, presiding in the Circuit Court of the United States for the Virginia district in 1807, all the Courts, both federal and State, so far as I am informed, have conceded this privilege to the accused, whenever it has been claimed. Although this has been the case, it has continued unsettled what it is that forms such a bias as will render a juror incompetent. It cannot be doubted, at this day, that personal prejudice or dislike is not the only ground of disqualification under this head. Whatever places the juror in a situation in which he has prejudged the case, equally demands his exclusion. For it is certain that where the mind is convinced from a correct knowledge of the facts, or from that evidence which it believes to be of the highest nature, of the guilt or innocence of an individual, that mind cannot weigh testimony with the impartiality which justice requires at the hands of the juror. For instance, if A was present when a homicide was committed, and believed he saw all the attendant circumstances, a witness who swore to some facts entirely different from what A believed them to be, which tended materially to vary the guilt or innocence of the different parties, would not make half the impression on the mind of A which he would do had A not been present. So if a man of respectability represent to his friend, that he had witnessed a homicide, and proceed to a minute detail of the facts; a conviction would be fixed upon the hearer, of the truth of those facts, which would inevitably tend to prejudice the mind in the investigation of testimony. In either of these cases, particularly the former, a witness of equal respectability, whose testimony tended to confirm previous impressions, would find a much more open ear than one whose evidence was of a different nature. That kind of conflict between witnesses which would produce doubt in a person who knew nothing of the circumstances, would have no such effect on one who stood in this situation. It seems clear therefore, that one who was present and saw the transaction, or who heard it detailed by one, in whom he had confidence, who had seen it, could not be considered as the " impartial juror" which the constitution requires. In the case of Vermilyea and others *ex parte*[e] Judge Woodworth says, "the late Chief Justice Spencer has stated the principles adop-

*Margin notes:*

JANUARY 1831

The State *v.* Williams.

*d* 1 Haywood 429.

*e* 6th Cowen R. 565.

ted by him, in the trial of Van Alstyne, for the murder of Huddlestone. It was thus: "if a person had formed or expressed an opinion for or against the prisoner, on a knowledge of any of the facts attending the murder, or from information of those acquainted with the facts, he considered it good cause of challenge; but if the opinions of the jurors were formed on mere rumors and report, he decided that such opinions did not disqualify the jurors." The case of Vermilyea and others had been tried in a Court of oyer and terminer held in the city of New York, and the defendants convicted of a conspiracy to defraud certain incorporated companies and individuals, of their goods, chattles, and effects. On the trial William Norwood was challenged for principal cause. The juror stated, that "he had heard all the evidence given on a former trial of the same persons for the same offence, having been present at it; that he had made up his opinion perfectly on the evidence, that the defendants were all guilty; and he had frequently expressed himself to that effect." Upon being inquired of by the district attorney, he stated that "he felt no bias or partiality for or against the defendants; that if the testimony given in this trial should appear as it did on the former, he should certainly find the defendants all guilty; and added, that he thought he felt competent to give a verdict according to his oath, and the evidence as it should appear." The Court decided that the juror stood indifferent, and he was accordingly sworn and sat on the trial. For this and other reasons application was made for a writ of *certiorari* to transfer the case into the Supreme Court. Notice of the application was given, by the direction of the Judge, to the district attorney, of the city and county of New York, and the questions presented were argued at length. The writ of *certiorari* was ordered; the judge expressing a decided opinion that the callenge should have been allowed. In the Supreme Court the case was ably argued, and the same judge delivered the opinion of the court at considerable length, which he concludes as follows; "My brethren on the bench concurring in the views I have taken, the consequence is, that a valid principal cause of challenge having been overuled in the court below, a new trial must be granted."

The case of *Pollard v. the Commonwealth* goes as far in overruling a challenge on this ground as any modern case I have met with, though probably no farther than

ANUARY 1831

The State
v.
Williams.

*f* 5 Randolph R. 668.

is warranted by strict law. In that case an application was made to the General Court of Virginia for a writ of error, to a judgment of the Superior Court for the county of Cumberland, whereby the petitioner had been convicted of murder in the second degree. The application was founded on an alleged error in the court's refusal to sustain the prisoner's challenge for cause, of a juror summoned to try him. It appeared, that, in the progress of the cause John H. Parker was called as a juror, and upon being sworn to answer questions said, "that he heard one of the witnesses testify in the case of the prisoner in the called court; that he did not know that he heard all the evidence given by that witness; that upon the evidence of the said witness he formed an opinion at the time, that he did not know that he expressed it, or did not; but thinks it most probable he did; that he had no prejudice against the prisoner or his cause at this time, that he believed he could give the prisoner as fair a trial as if he had never heard any thing on the subject." The court determined that the above circumstances formed no cause of challenge. The General Court, after conferring on the subject, decided that Parker was an impartial juror, and overruled the application for a writ of error.

It may be thought upon first view that this case conflicts with the opinions of judges Spencer and Woodworth; but upon examination it will be found that there is nothing irreconcilable between them. It does not appear what kind of testimony the witness heard; it may have been altogether circumstancial, and although it was sufficient to impress him with the idea that the accused was guilty, it is true; yet that impression must have been quite unsettled, which was evinced by the slight recollection he had with regard to it; and we must suppose had not made any such impression upon his mind, as closed it against the full effect of the testimony which might be offered on the trial. The common consent of ages declares that one who has fully heard the testimony in a cause, or even the evidence given before the grand jury, is liable to be challenged for cause, on the trial of an indictment for a high crime or misdemeanor: The Statute 25. Edward III. c. 3. expressly enacts, that no indictor shall be put in inquests, upon the deliverance of the indictees of felonies or trespass, if he be challenged for that same cause, by him which is so indicted; and Hawkins observes that "this statute seems to have been made in affirmance of the common law."

Certainly then, if those who have received the evidence in an exparte manner, are liable to be challenged for cause at common law, such as have heard the whole evidence are more objectionable.     It seems therefore to be a reasonable conclusion, and one which is sustainable upon authority, that in such cases a juror who has received an account of the facts of a case from one who knew them, may be challenged, either by the accused or the prosecuting officer, for cause.

It is now necessary to consider whether this is the boundary of the rule, or whether it goes further.    It is insisted by the counsel for the accused in this case, that wherever a juror has heard a common rumor or report with regard to a transaction for which the person on trial is indicted, and has expressed his opinion with regard to the guilt or innocence of the accused even hypothetically, he is liable to be challenged for cause.    He has urged many ingenuous arguments in support of his position, and cited several authorities, which he contends sustain him. Among the authorities principally relied on, is the opinion of Judge Marshall given on the trial of Burr.    It is difficult to ascertain from that opinion precisely what Chief Justice Marshall considered necessary to sustain such a challenge, and the reason of this is apparent.    He was not revising a case, by which it would have been necessary for him to have laid down a plain principle of law, but was taking those steps which were necessary to secure equally to the country, and the accused, complete justice. It was not material in securing this justice to the country, that the strict legal line should be drawn in the selection of jurors.    Those who had never heard of the case, would have been as safe depositories of the dignity and rights of the United States as any other citizens, and there can be no doubt but the court felt inclined to go as far in admitting challenges to prevail, as it could, while it secured the reasonable prospect of obtaining a jury to try the case. For this reason in many instances, jurors were ordered to stand aside that they might undergo a further examination in the event of the panel becoming exhausted.    It is true that all the principles of law laid down by the court are sound as regards opinions which have been formed, and their effect upon the mind; this is obvious to every reader; but the difficulty is in reducing these principles to practice, and in laying down certain questions and answers, which will perfectly secure their due application.    It is obvious

that this difficulty was felt on that trial; for at no time was a particular set of questions prescribed, or a particular set of answers required. There was a general object in view, that was to ascertain if the jurors had such fixed opinions of the guilt of the prisoner as would prevent their doing him justice; and wherever there could be a doubt on that subject they were rejected; and from a commendable caution, in some instances when there could indeed be no doubt, but because it was expected that others more perfectly free from all objection even in the eyes of the prisoner, might be obtained. The Chief Justice observes in that case, "the jury should enter on the trial, with minds open to those impressions, which the testimony and the law of the case ought to make, not with those preconceived opinions, which will resist those impressions." And again, "It is admitted, that where there are strong personal prejudices, the person entertaining them is incapacitated as a juror; but it is denied that fixed opinions respecting his guilt constitute a similar incapacity." It would seem therefore, if the opinions were not "fixed," if they had been formed under circumstances which left " the mind open to those impressions, which the testimony and the law of the case ought to make," they would not be sufficient to exclude a juror. In the case of Burr several parts of the testimony were known by the community generally. Letters had been published, written by some of those who were to be witnesses on the trial; the newspapers in all quarters of the Union, had teemed with publications on the subject; many of them professing to give the facts of the case. Persons who were in the habit of reading those publications and of attending to the proceedings of the government, were liable to have strong feelings and prejudices excited. The idea that an attempt was about to be made of a treasonable nature, against our happy political institutions, was calculated to arouse the resentment of men of ardent feelings, particularly against one who stood in the situation that Burr did; and a greater latitude should have been given to the accused to secure justice, than in ordinary cases. When we come, however, to examine the proceedings in that case, we shall find that almost the identical questions were put to some of the jurors, which were put to Hall in the Circuit Court, and the same answers in substance given, yet it was determined that there was no ground for challenge for cause. The Chief Justice, *ᵍ* after dwelling upon the

ᵍ Page 418.

JANUARY 1831

The State
v.
Williams.

challenge of Basset in Calender's case, says, "this was going no father than Mr. Morris' has gone, the challenge against whom has been overruled. Mr. Morris had frequently declared that if the allegations against the prisoner were true, he was guilty, and Mr. Morris was determined to be an impartial juror." I have dwelt the longer on this case, because it is one in which the subject I am now examining, occupied more of the attention of the court than in any other which I have met with; and I do not think we are authorized to come to the conclusion that an opinion of guilt formed from mere rumor or common report, is in any part of it determined to afford ground for a challenge for cause.

The case of Fries [h] decided in Pennsylvania by Judges Iredell and Peters, has also been relied on by the counsel for the defendant. That was a motion for a new trial. Two grounds were laid, the second of which was, "that there had not been *an unbiased and impartial jury.*" The facts were, that Rhodes, one of the jurors, after he had been summoned as such, declared at several places, at several times, and to several persons, in substance as follows; "That he was not safe at home for these people, [i] that they ought all to be hung, and particularly, that Fries must be hung." The juror was confronted with the witnesses who attested these declarations and denied them, as pointed particularly at Fries; but admitted that he had made a general expression, indicative of his disapprobation of the conduct of the insurgents. The prisoner was not apprised of these facts until after the jury was sworn. Iredell, Justice, was of opinion that a new trial should be granted because "one of the jurors had made declarations, as well in relation to the prison personally, as to the general question of the insurrection, which manifested a bias or predetermination, that ought never to be felt by a juror." Judge Peters did not think the cause sufficient, but yielded to the opinion of Judge Iredell, and the new trial was granted. It is obvious in this case, that Judge Iredell believed the juror had made the declarations with respect to the accused which were ascribed to him. He had declared that Fries must be hung. This was a possitive declaration, and appears to have been made with at least, a general knowledge of the facts of the case. The juror appears to have lived about the scene of the insurrection; and what made the case still stronger, was an apprehension of personal danger, and the peculiar manifestation of ill

*h* 3 Dallas R 575.

*i* meaning the insurgents.

feeling towards Fries. But are we authorized, from the report of this case to believe, that if the juror had declared, that "if the facts of the case were such as they were commonly represented to be, the accused should be hung; that he believed them to be true, but if upon the trial the evidence should differ from the reports, he should be open to a conviction of his innocence," that a new trial would have been granted? Far from it. In 3rd. Thomas' Coke*j* we have this passage; "he that is of a jury must be *liber homo*; that is not only a free man and not bond, but also one that hath such freedom of mind as he stands indifferent as he stands unsworn." We are not informed however, who it is that stands in this situation, and cannot presume that it includes all those who had heard reports about the circumstances of a case and formed vague opinions from them.

*j* Page 500.

Upon my investigation of the authorities, I have arrived at the conclusion that the course pursued in the Circuit Court on this subject, did not violate any rule of law which has been laid down by other courts. Nor can I think that Justice requires such a rule, as the one contended for by the defendant's counsel, now to be established. When opinions are expressed with regard to the nature of an act which is reported to have happened, those opinions, and the minds of the persons expressing them, are rather directed to the circumstances which have been detailed, than to the person who is said to have committed them. Suppose A is told that it is reported that B has without provocation put C to death or waylaid and murdered him, and immediately declares, if this be true he should be hung. Can any one believe for a moment that this ought to disqualify A from serving as a juror on the trial of B? Surely it cannot be contended that this affords the least indication, that as a juror, he would be unable to weigh all the evidence which might be introduced, with the utmost impartiality. It is the natural exclamation of a generous mind, upon hearing of so foul a deed; a mind, which, as it hated crime, would be most apt to look with the utmost anxiety for some circumstances of mitigation, when the facts came to be examined. And if such would be the case when the single act of murder was declared, it would be equally so if a detailed accout of many transactions were given, tending to the same result. The very manner of making the declaration of the opinion, would evince an unwillingness to believe that the horrid crime had been

perpetrated.   But the consequences of settling such a princi- <span>JAN'Y 1831</span>
ple would be most unfortunate.   The more heinous the offence,
the wider and more rapidly a report of it spreads; and it would <span>The State</span>
only be necessary that a crime should be of a most novel and <span>v.</span>
alarming nature, to prevent the conviction of the culprit.—— <span>Williams.</span>
The extraordinary character of the offence, would cause re-
ports about it to be circulated through every neighborhood of
the county, and produce a general expression of condemna-
tion.   The criminal himself, from the consciousness that it was
his only hope of impunity, particularly if he had.wealth and
friends, might artfully obtain an expression of the opinion, gi-
ven upon rumor, of all the qualified jurors in the county, out
of which, by our constitution, he could not be tried.   My con-
clusion, on this branch of the case, is, that the decision of the
Circuit court was right.

The fourth objection to the proceedings of the Circuit court,
is, " the discharge of one of the jurors, without the consent
of the defendant, after he had been accepted by him, and
sworn."

It appears from the record, that John Stewart was sworn on
his *voire dire*, put on the prisoner and accepted by him, and
sworn to pass on the trial.   After six other jurors had been
sworn, the counsel for the state, having ascertained that Stew-
art was not a resident, or a householder, or a freeholder, of the
county, moved the court to exclude him from the jury ; and
after eleven jurors had been sworn besides Stewart, the court
told the prisoner, that unless he then accepted the said juror,
he would be discharged.   The prisoner, by his counsel, said
he declined expressing assent or dissent ; and the court dis-
charged the juror, against the prisoner's objection.

But few authorities have been cited, and I believe, but few
can be found, directly on this point, in cases which have been
tried within that period of the English history, in which the
rights of the subject have been properly appreciated.   The
authorities, however, so far as I have been able to examine
them, are uniform.   Lord Coke, in his first Institute, book 3,
ch. 9, says, "If a juror be formerly sworn, if he be challeng-
ed, he must show cause presently, and that cause must arise
since he was sworn."   And so Hawkins, in his "Pleas of the
Crown," in his 2d volume, page 568, lays it down as a univer-
sal rule, " that no juror can be challenged, either by the king
or the prisoner, without consent, after he hath been sworn, un-
less it be for some cause which happened since he was sworn."
In Wharton's case, reported by Yelverton, page 24, it appears,

"that upon the arraignment, Wharton, Young and Purefoy, being indicted of murder for the death of one Hallakinden, it happened at the first day, when the prisoners were to be tried, eleven jurors appeared and were sworn ; but one was challenged by the prisoners, and so, for that time, the trial was stayed. Upon a *tales* taken for the queen, at another day, when the jury appeared, one of the jurors, who had appeared before and was sworn the first day, was challenged, for a cause that was *in esse* the first day, but then not known to the queen, but which came since to the knowledge of the queen's counsel. And, upon a doubt conceived by the court of King's Bench, Yelverton, Justice, went into the Common Pleas, to know their opinion; and the opinion was, that the queen could not have the challenge now, no more than she could have had it the first day, after the juror had been sworn, although the same cause continues yet."

It would seem, therefore, that the authorities, without contradiction, are opposed to the right of challenge by either party, for a cause which has happened before the juror was sworn. It has even been laid down as law, by some of the most learned ancient lawyers, that after a jury was sworn, it could not be discharged without a verdict, for any cause whatever.— Lord Coke, in his first Institutes, 227, (b) declares this to be the law—so that it was his opinion, that this could not be done by consent of all parties. Foster, Justice, however, in his opinion, in the case of the Kinlochs, denies this to be law, and he was certainly right. He says, that "most of the objections which were made to the power, may receive this short answer, that they are levelled at an improper exercise of the power."

In modern times, and particularly in the United States, the courts have often discharged juries, after they had been sworn, without their having rendered a verdict; but this, so far as I am informed, has always been done for some cause which happened after they were sworn. I know of no case in which this has been done, for any cause which existed before. Foster, Justice, in speaking of the discharge of juries in this situation, says : "I take it to be one of those general questions, which are not capable of being determined by any general rule, that hath hitherto been laid down, or possibly ever may be. For I think it impossible to fix upon any single rule, which can be made to govern the infinite variety of cases, which may come under this general question, without manifest absurdity ; and, in some instances, without the highest injustice." He was

certainly right, when he said no general rule could be laid down for the government of all cases of this kind, which may arise. Every case must be decided upon its own peculiar circumstances, although there is a manifest distinction between the power of a court to discharge a jury after it is sworn, and the power of one of the parties, to make a principal, or other challenge of a juror, after he is sworn. Yet, I presume, much the same rules would now be applied to both. It appears to be clearly and distinctly laid down, in the authorities referred to, that nothing is a ground of challenge in a capital case, after a juror is sworn, but something which happens subsequent to his being sworn. The authorities do not say, a juror may be challenged for some disqualification, which is discovered after he is sworn; but only for that which happens after. I have seen no case which conflicts with this rule. There is no doubt, were the accused to consent to such challenge, it would be as completely out of his power, afterwards, to take any advantage in consequence of it, as it would be to arrest or reverse a judgment because a jury had been discharged from rendering a verdict, by consent of the parties. But it is insisted, in behalf of the State, in this case, that if the trial had proceeded, the want of qualification in the juror objected to, would have been sufficient cause for setting aside a conviction, and granting a new trial : and this would have been the certain result of proceeding with the trial, with Stewart as one of the jury. If this be so, and Stewart was rejected from the jury, at a time when the prisoner could not have been injured by it, I agree, it would have formed one of those exceptions, which would have made it the duty of the court, to act as it did.— But I cannot yield my assent to this position. It is true, the statute which prescribes the qualifications of jurors, is intended to secure the most competent citizens, to discharge that important trust. But many persons, who are as competent as any others, to discharge the duties, have not the legal qualifications. It would be trifling with the solemnities of judicial investigations, to annul verdicts rendered by men, every way intellectually and morally qualified, merely because one of them did not live within a particular county, or was not a householder. Besides, when the juror was called upon, it was in the power of either of the parties to have examined him, with respect to his qualifications; and by not doing so, the right was waived. Nor can the circumstance of the prisoner not having expressed assent or dissent to the proceeding of the court, be considered as having precluded him from now making the objection.

By refusing to consent, he impliedly objected, and he cannot be presumed to have agreed to yield up a juror, who had been previously elected by him, as one of his triers. But the prisoner may have been deprived of an important advantage, by the course pursued by the court. A list of the jurors had been served on him, to enable him to make a selection of such as he was most willing to confide his life in the hands of. It is highly probable he had, among them, a first and second choice. Whenever, by a challenge for cause made by the state, he lost one of those included in the first choice, he would be compelled to resort to one, not so acceptable as the one thus challenged, but more so than others. Now, if Stewart was one of those included in the first choice, after he was sworn, one who stood among those placed in the second choice, would be given up, and, so far from being accepted by the prisoner, would be the subject of a peremptory challenge, while he considered Stewart as one of the jury. It would, therefore, have been less objectionable, to have discharged Stewart, when the objection was first made, than to have waited until after the pannel was full.

In every light, in which I can view the subject, I am brought to the conviction, both upon principle and authority, that the Circuit court erred, in discharging the juror, Stewart, after he had been sworn, and without the consent of the accused.

It only remains to determine the effect of this decision.— I have, in part, anticipated this part of my duty, but will give it a more particular examination. The question is, can he be tried again, or must he be discharged? Our Bill of Rights, section 13, declares that "no person shall, for the same offence, be twice put in jeopardy of life or limb." It is insisted by the defendant's counsel, that the prisoner's life has once been in jeopardy, and that, upon a reversal of the judgment, he is entitled, under this provision, to a discharge. But, can it be the meaning of the constitution, that if, for one of the thousand inaccuracies, which may be committed in the prosecution of one, who is charged with a high crime, the judgment is arrested or reversed, this is intended to amount to an acquittal? The forms of proceeding in such cases, which are required by law, are deemed necessary to secure to the accused, a fair and impartial trial; they were never intended to afford him the means of escape, without it. This provision could have had nothing more in view, than to prevent a citizen from being tried a second time, after a jury of his country had once acquitted him. Viewed in this light, it is a most valuable safe-

guard ; but, considered in any other way, it would afford a
shield to the guilty, and probable impunity to the most artful.
According to general inference of law, all citizens are ac-
quainted with the law.  The man, then, who has been unlaw-
fully convicted, is considered, not only as never having been
in jeopardy, by the verdict which has been rendered against
him, but as not even having considered himself so.  But it is
unnecessary to dwell upon technicalities : it is plain that the
construction given to the clause in the constitution, by which
the prisoner would be discharged from further prosecution,
cannot be sustained by it.  It is true, cases have been cited
in support of the position; but the reasoning is not satisfacto-
ry.  The accused, having been tortured by the agony of an
arraignment and trial, &c., can afford no argument on this sub-
ject.  Many criminals, whose deeds of darkness have never
been brought to light, have, no doubt, often, under the appre-
hension of discovery and punishment, felt as wretchedly as
they could have done, while hearing the sentence of death
pronounced against them.  A man's jeopardy cannot be de-
termined on by the extent of his fears.  It is by legal rule
that this must be ascertained; and so long as the rules of law
protect him from punishment, without having passed upon his
guilt or innocence, that long he has never been in jeopardy.

I admit, there are exceptions to this rule.  If one, charged
with a capital, or any other offence, has been put upon trial,
and a jury sworn to pass upon his case, and that jury is dis-
charged, by the act of the court, when the accused would oth-
erwise have been acquitted, this will entitle him to a discharge
from the prosecution.  This position is established by the case
of *The People* v. *Barrett &* W*ard.*[a]  After the jury was sworn,
in this case, the district attorney served on Barrett, a notice
to produce a promissory note, mentioned in the indictment,
or that parol testimony would be given of its contents ; and
asked his counsel if they were ready for trial, to which they
answered, they were.  The note not being produced, the dis-
trict attorney offered the parol evidence.  To this the accused
objected, alleging the want of due notice, as the note was at a
house, fourteen or fifteen miles distant; and the judge, sustain-
ing the objection, refused to permit the parol evidence to be
adduced.  Whereupon, the district attorney moved for leave
to withdraw a juror, which was granted, without the consent
of the defendants.  On a subsequent day they were again ar-
raigned, tried and found guilty, on the same indictment.  This
case was carried to the Supreme court of New York, for revi-

JAN'Y 1831 sion.  In that court it was determined that the defendants
should be discharged; but it was, evidently, on the ground,
The State that they were entitled to their trial, upon such evidence as
v. could then have been adduced against them ; and, as the court
Williams. had withdrawn the case from the jury, when the defendant had
a right to their verdict, it was considered tantamount to an ac-
quittal.  Judge Livingston, in, delivering the opinion, says :
" Without denying the right of courts to withdraw a juror, in
criminal cases, and put the defendant on his trial a second
time, it is evident this power should not be lightly used, &c."
" We do not mean, at present, to define all, or any of the cases,
in which this practice may be pursued ; but we all agree, that
a defendant ought, in no case, to be put on a second trial for
the same offence, where a juror has been discharged on no
other ground than because the public prosecutor found him-
self unable to proceed, for the want of sufficient testimony to
convict."  Thus, the right to award a new trial, after the dis-
charge of the jury, without the consent of the accused, was
recognised.  That was determined to be a case, in which its
exercise was improper.

a18 John-     In the case of *The People* v. *Goodwin,*a indicted for man-
son, 187. slaughter, the jury, after having been out for several hours,
and until within half an hour of the legal termination of the
sessions, and not having agreed on their verdict, were discharg-
ed by the court.  It was contended, that he could not again be
tried, on the indictment.  Chief Justice Spencer gave an ela-
borate opinion in the case, and the court unanimously deter-
mined that the accused should not be discharged, but again be
tried.

b2 John-    In the case of *The People* v. *Olcott,*b Judge Kent went into
son's cases a full examination of all the authorities upon the power of the
301. court to discharge a jury, in criminal cases, and the conse-
quences of its exercise.  In that case, the jury, after having
remained out from eight o'clock on Staturday evening, until
near two o'clock the next day, and having, in the mean time,
come into court two or three times, for advice, declared there
was no prospect of their agreeing in their verdect, and were
discharged, without the consent of the prisoner.  One of the
questions was, whether the discharge of the jury entitled the
defendant to a discharge from the prosecution, or whether he
could again be put upon his trial?  After examining and com-
menting on all the authorities, that celebrated jurist unhesita-
tingly decided that the defendant should be re-tried.  Although
this was a case of misdemeanor, the reasoning is entirely ap-

plicable to cases of felony ; and a perusal of it will satisfy the <span style="font-variant: small-caps">jan'y</span> 1831 inquirer, that it comprehends every possible case of a trial for crimes.

In the case of *The King* v. *Edwards,a* the indictment was for a felony; and while the prosecutor was giving his evidence, one of the jurors fell down, in a fit, and he was pronounced by a physician, on oath, incapable of proceeding in his duty, as a juryman, that day; whereupon, the jury was discharged, and a new jury sworn, and the defendant was convicted.— The point, whether the prisoner could be tried, after the discharge of the jury, without consent, was argued before all the judges in England, except Mansfield, Chief Justice, and Lawrence, Justice; all the cases were cited, and the judges, without hearing the counsel for the crown, said, that it had been decided in so many cases, it was now the settled law of the country, and gave judgment against the prisoner.

In the case of the *United States* v. *Coolige,b* a witness refusing to be sworn, the trial was suspended during the imprisonment of the witness, for the contempt ; and Mr. Justice Story held, that the discretion to discharge a jury, existed in all cases ; but that it was only to be exercised, in very extraordinary circumstances.

In the case of *The Commonwealth* v. *Bowden,c* upon an indictment for high-way robbery, a similar decision was made ; and so late as the trial of one of the Knapps, it has again been repeated.  In fine, authorities might be multiplied, without number, to the same effect; but I deem it useless to add to those already cited.  All those authorities, however, agree, that the power of discharging juries, in cases of indictment, should be used with great caution.

From the examination which I have given this case—and it has been a close and patient one—I am satisfied that the defendant has no right to a discharge, but that he should be again tried on the indictment : and, of this opinion is a majority of the court.

Therefore, let the judgment be reversed, and an order made, that the Circuit court of Autauga county, award a *venire de novo,* &c.

JUDGE SAFFOLD concurs in the result of the majority.

JUDGE PERRY dissents in part.

Reversed and remanded.

*The State v. Williams.*

*a*4 Taunt. 309.

*b*2 Gallis. Rep. 364.

*c*9 Mass. Rep. 494.