## AARON AND ELY (freedmen) vs. THE STATE.

[INDICTMENT FOR LARCENY OF MULES.]

1. *Larceny of mule by freedman; punishment of, since 22d September,* 1865. The act approved October 7, 1864, which punishes the larceny of a horse or mule, and other offenses therein named, either with death, or with imprisonment in the penitentiary for not less than ten years, at the discretion of the jury, (Session Acts, 1864, p. 19,) since its ratifi-

cation by the ordinance of the State convention adopted on the 22d September, 1865, applies equally to freedmen and to all other persons.

2. *Charge on portion of evidence.*—A charge which instructs the jury that, if they believe certain specified facts, they must find the defendant not guilty, ignoring other facts which the evidence tends to prove showing his guilt, is properly refused.

3. *Carrying stolen property into another county.*—Where property, which has been stolen in one county, is carried by the thief into another county, he may be prosecuted and convicted in the latter county.

4. *Authority of circuit court at special term.*—It is no objection to a judgment and conviction in a criminal case, that the indictment was found at a special term of the circuit court, and the trial had at the same term.

5. *Asking prisoner, on conviction, if he has aught to say in arrest of judgment; presumption in favor of judgment.*—It is not necessary that the record, in a case of felony, should affirmatively show that the prisoner was asked by the court, before sentence was pronounced against him, if he had anything to say in arrest of judgment: the question will be presumed to have been asked, unless the record affirmatively shows that it was not. (JUDGE, J., *dissenting*.)

FROM the Circuit Court of Tuskaloosa.

Tried before the Hon. WM. S. MUDD.

THE indictment in this case was found on the 28th November, 1865, and charged the prisoners, "Aaron, a freedman, usually known and called Aaron Cosby, and Ely, a freedman, usually known and called Ely Carlisle," with the larceny of two horses, the property of Christopher C. Farrar, in the county of Tuskaloosa. The prisoners severally pleaded not guilty, without interposing any objection to the indictment. The evidence adduced on the trial, and the rulings of the court in connection therewith, are thus stated in the bill of exceptions:

"The State introduced Christopher C. Farrar as a witness, who testified, that on the night of the 16th November, 1865, two sorrel horses belonging to him were stolen from his enclosure in Perry county, about sixty-five miles from Tuskaloosa, by some person or persons unknown to him; that, having been informed that the said horses were in Tuskaloosa, he came here, and found them, and got possession of them; and he identified them as his property, and as the horses described in the indictment, and said that they were worth at least one hundred and fifty dollars; and

he testified, also, that the prisoners lived in his vicinity, and were both slaves on the 7th October, 1864. The State then introduced Daniel McGee and Thomas Drake as witnesses, who testified, substantially, that on the 19th November inst., having learned that some negroes were in town offering some horses for sale, and suspecting that they were stolen horses, they went to inquire of the negroes, in order to detect and arrest them; that they found one of the horses in the possession of the prisoner Ely, and inquired of him, if there were any horses there for sale; that Ely replied, that there was one there for sale, and that the other had been sold; that he was then asked the price, and replied, 'I do not know the price, another man has the selling of them'; that Ely was then told that he was a prisoner, and was arrested. Said McGee, having found out where the other horse was, went and got it, and was informed that the price paid for it was thirty dollars. This horse had been sold by Aaron, who, coming up, about this time, where said witnesses and Ely were, and being questioned on the subject as to where he got the horses, replied, that he had bought them, in the night, from a negro whom he did not know, and paid seventy-five dollars for them. The price for which the horse had been offered in Tuskaloosa was thirty dollars each, and one of them had been sold at that price, and a watch taken in pledge for the payment of the money. It was in evidence, also, that Ely was the younger of the two prisoners, and was quite a youth in appearance.

"On this state of facts, the court charged the jury, among other things, that if they found the defendants guilty as charged, and that the offense was committed at the time stated by the witnesses, then the defendants would be liable under the act approved October 7, 1864, entitled 'An act to punish certain offenses therein named'; which act was read in charge to the jury. The prisoners excepted to this charge, and requested the court to instruct the jury, that if they believed the prisoners were slaves on the 7th October, 1864, then they would not be liable to be tried or punished under said act approved on that day; which charge the court refused to give, and the prisoners excepted to its refusal.

"The prisoner requested the court to instruct the jury, also, that the fact that Ely was found in company with Aaron was not sufficient to convict him, unless they believed, from the evidence, that he was guilty of aiding in the stealing of the horses; which charge the court gave as requested. The prisoners asked the court to charge the jury, also, that if they believed Ely, when asked the price of the horses, said that he did not know the price, and that another man had the selling of them, (referring to Aaron,) that these words in answer were sufficient to rebut the presumption of guilt arising from Ely having been found, in company with Aaron, in the possession of one of the horses, as detailed by the witnesses. The court refused this charge, and the prisoners excepted to its refusal."

The jury returned a verdict of guilty against both of the prisoners, sentencing Aaron to be hanged, and Ely to be imprisoned in the penitentiary for twenty-five years. The minute-entry, after setting out the verdict, proceeds thus—"It is therefore considered by the court, that the said Aaron Cosby, a freedman, be punished with death by hanging, and that the said Ely Carlisle, a freedman, be imprisoned in the penitentiary for twenty-five years." The prisoners moved in arrest of judgment, on the following grounds: "1st, that said act of October 7, 1864, is not applicable to them, and was not intended by the legislature to be so applied; 2d, that the said act is nugatory, and was nugatory at the time of the commission of the offense charged; 3d, because the court had no jurisdiction of the case; and, 4th, because the jury found the prisoners guilty without adequate evidence." The court overruled the motion in arrest, sentenced Aaron to be hanged on the 9th day of March, 1866, and suspended the execution of Ely's sentence until the expiration of sixty days after the commencement of the next ensuing term of the supreme court.

WM. R. SMITH, for the prisoner.

JOHN W. A. SANFORD, Attorney-General, *contra*.

JUDGE, J.—[1.] The act of October 7, 1864, under which the prisoners were tried and convicted, was ratified

by the State convention on the 21st day of September, 1865; a day anterior to the commission of the offense. It has been decided at the present term, that from the date of its ratification that statute has been in force in this State; *(Jeffries & Jeffries v. The State;)* and we hold that it is applicable to all persons in the State, the class known as freedmen included.—*Eliza v. The State,* decided at the present term. Consequently, there was no error in the charge given, nor in the refusal to give the charge requested, relating to this act.

[2.] The court was requested to charge the jury, that if they believed " that Ely, when asked the price of the horses, said that he did not know the price, that another man had the selling of them, (referring to Aaron,) that the words in answer were sufficient to rebut the presumption of guilt arising from Ely having been found, in company with Aaron, in possession of one of the horses, as detailed by the witness." The bill of exceptions does not purport to set out all the evidence; and if this charge appeared on its face to be legal and proper, still the intendment would be, that there was other and sufficient evidence, to justify the court in refusing to give it. Error will not be imputed to the court below, when it does not affirmatively appear.—*Eskridge v. The State,* 25 Ala. 30; *Butler v. The State,* 22 Ala. 43; *McElhany v. The State,* 24 Ala. 71; 25 Ala. 57. But the charge, on its face, was improper, in asking the court to invade the province of the jury, by deciding on the *sufficiency* of evidence to rebut the presumption of guilt arising from other evidence.—*King v. Pope,* 28 Ala. 602; *Stanley v. Nelson,* 28 Ala. 514. It was properly refused, too, for another reason. The record shows that there was other evidence in the case, affecting the prisoner Ely, than that of his having been in company with Aaron in possession of one of the stolen horses; for instance, the proof of his residence in the vicinity of the theft, which was likewise the residence of Aaron; and his silence, or failure to account, when arrested, for his possession of one of the stolen horses. Thus, the charge *selected* from the evidence a portion only of the facts disclosed tending to prove the guilt of Ely; and, had it been given, it would have restricted

the jury, in considering the presumption of guilt, to this *selected portion* of the testimony.—*Ogletree v. The State*, 28 Ala. 693.

[3.] The proof tended to show that the horses were stolen in the county of Perry; and it appeared in evidence that they were found in the possession of the prisoners, in the county of Tuskaloosa. The indictment was properly found in the latter county; for, with respect to larceny, the offense is considered as committed in every county, or jurisdiction, into which the thief carries the goods; the legal possession of them remains in the true owner, and every moment's continuance of the trespass and felony amounts to a new caption and asportation. Unde. the Code, (§ 3514,) it was not necessary to state the venue; L ⸴ the statement of it was sustained by the proof.

[4.] The court below had jurisdiction of the case, although the indictment was found, and the case tried at a special term.—See Act of 27th November, 1865; Code, § 634; Acts 1863, p. 20; *Nugent v. The State*, 19 Ala. 540; *Harrington v. The State*, 36 Ala. 236.

[5.] It does not appear by the record that the court, before pronouncing sentence upon the prisoners, inquired of them if they had anything to say why the sentence of the law should not be pronounced upon them. By the common law, this is an indispensable question in all cases of conviction for felony. In *The King v. Spekes*, (3 Salkeld, 358,) a judgment in a prosecution for high treason was reversed, because the court did not ask the defendant, before pronouncing sentence, "what he had to say for himself, why judgment should not be given?" This is a necessary question, said the court, because he may have a pardon to plead, or may move in arrest of judgment. The like decision was made in *Rex v. Geary*, (2 Salkeld, 630,) although the defendant had pleaded guilty to the charge. In 1st Archbold's Criminal Pleading, (pp. 180–1, note 4,) it is said : " Before judgment is pronounced upon the defendant, it is indispensably necessary that he should be asked by the clerk, or court, if he has anything to say why judgment should not be pronounced on him ;" citing 1 Chitty's Criminal Law, 700. In *West v. The State*, (2 New Jersey, 212,)

it was thought not necessary to ask this question, except in capital cases; but, in the later case of *Safford v. The People*, (1 Parker, 474,) it was considered essential in all cases of felony.—2 Leading Crim. Cases, 452, note. Indeed, the current of authority is very decided, as to the indispensable necessity of making this inquiry, in all convictions of felony. It is not a mere *form*, but is a *substantial right*, given by the law. If a prisoner has no ground to allege in arrest of judgment, no pardon to plead, he may addresss the court in mitigation of his conduct, desire its intercession with the pardoning power, or cast himself upon its mercy.—1 Archb. 180–1, note 4. And it is ·easy, in all such convictions, to propound the question, and to let the record show it.

In this case, the record shows that sentence was pronounced upon the prisoners; but it is silent as to whether the question was asked. A majority of the court believe that it is our duty to presume that the question was asked; and they cite the following authorities in support of their opinion: *Paris v. The State*, 36 Ala. 232; *Ben v. The State*, 22 Ala. 9; *State v. Williams*, 3 Stewart, 454; *Harrington v. The State*, 36 Ala. 236. While these authorities are very persuasive to authorize the conclusion drawn from them by my brothers, yet they relate principally, if not entirely, to preliminary steps in the prosecution; and presumptions may the more readily be drawn against a prisoner, for not objecting or excepting to omissions and irregularities in these preliminary steps, when he is attended by counsel, and has a far better opportunity for thus excepting, than when brought to the bar to receive his sentence, not always attended by counsel, and in a distressed and dejected condition. Therefore, I would not be for extending the authorities above cited, beyond application to similar cases. For I hold, with Chief-Justice Gibson, in *Hamilton v. The Commonwealth*, (4 Harris, 129,) the omission from the record in that case having been identical with the omission in this, that "the forms of records are deeply seated in the foundations of the law, and as they conduce to safety and certainty, they surely ought not to be disregarded, when the life of a human being is in question." And in the language of another eminent judge of the same State, "If we let in

presumptions to supply omissions and defects in records, it will by and by be deemed scarcely necessary to show by the record any of the important safe-guards of the trial by jury; and the common-law forms, stoutly asserted as a shield of liberty, by the Hampdens, Russels, and Sidneys, of other days, will lose their value."—*Dunn v. The Commonwealth*, 6 Barr, 384.

A majority of the court differing from me as to the presumption to be drawn from the record, in relation to the point last discussed, it results that the judgment of the circuit court must be affirmed, and the sentence of the law executed on both the prisoners.